In re WACCAMAW'S HOMEPLACE,
et al., Debtors.

HomePlace of America, Inc., on behalf
of all affiliated Debtors, Plaintiff,

v.

Toastmaster, Inc., Defendant.

Bankruptcy No. 01–0181 (PJW).
Adversary No. 02–07102 (PJW).

United States Bankruptcy Court,
D. Delaware.

May 31, 2005.

Laura Davis Jones, James E. O'Neill, Scotta E. McFarland, Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., Wilmington, DE, Andrew W. Caine, Harry E. Douglas, IV, Pachulski, Stang, Ziehl, Young, Jones & Weintraub P.C., Los Angeles, CA, for Plaintiff HomePlace of America, Inc., et al.

Bruce E. Jameson, D. Benjamin Snyder, Prickett, Jones & Elliott, P.A., Wilmington, DE, Dennis E. Quaid, Richard Chapman, William K. Carter, Fagel Haber, LLC, Chicago, IL, for Defendant, Toastmaster, Inc.

## MEMORANDUM OPINION

PETER J. WALSH, Bankruptcy Judge.

This is the Court's ruling following a one-day trial on HomePlace of America, Inc.'s ("HomePlace") Code § 547 complaint against Toastmaster, Inc. ("Toastmaster") to recover $390,579.10 of transfers made during the preference period. For the reasons set forth below, the Court finds in part for HomePlace and in part for Toastmaster.

Toastmaster is an affiliate of Salton, Inc. ("Salton"). The trial of the subject adversary proceeding was conducted immediately following the trial in the matter of *HomePlace of America, Inc. v. Salton, Inc.*, Adv. Proc. No. 02–07101 (the "Relat-

ed Proceeding"). The record in the Related Proceeding is also applicable here. Reference is made to the Court's memorandum opinion of this date in the Related Proceeding (the "Salton Opinion") for a discussion of matters pertinent to this opinion, including the factual background, the Code § 547(b) findings, the Industry[1] practices, and the law relating to the Code §§ 547(c)(2) and 547(c)(4) defenses. The following discussion supplements the Salton Opinion as needed to focus on the specific facts relating to the Toastmaster transactions.

## SUPPLEMENTAL BACKGROUND

Toastmaster is a small appliance vendor and manufacturer, with its principal place of business in Columbia, Missouri. In July 1999, Salton purchased Toastmaster and Toastmaster is now a wholly-owned subsidiary of Salton.

Prior to Salton's acquisition of Toastmaster, HomePlace purchased Toastmaster products through a third-party distributor, Professional Housewares Distributors. HomePlace began ordering products directly from Toastmaster in May of 2000. HomePlace and Toastmaster continued transacting business with each other up to the time HomePlace filed its chapter 11 petition.

All orders that HomePlace made before the end of June of 2000 were subject to "Extended Dating" or "Big Buy" terms. (Richter, Tr. 3, p. 144, 1.17–18.) The terms for the Big Buy program were offered to Terry McAllister ("McAllister"), a buyer for HomePlace, by Greg Richter ("Richter"), Eastern Sales Director for Toastmaster, and Jim O'Brien ("O'Brien"), an independent sales representative for Toastmaster. Such terms called for "split dating" with 50% of the program to be

paid on November 10 and the remaining 50% due on December 10. (Richter, Tr. 3, p. 145, 1.16–18.)

All orders placed after July 1 were subject to "net 30" days terms. (Richter, Tr. 3, pp. 150, 1.25—151, 1.15.) Such terms provided that payments were due "net 30" days from the date of receipt of the goods or receipt of the invoice, whichever was later.

During the ninety days preceding the petition date, HomePlace made payments to or for the benefit of Toastmaster in the aggregate amount of $390,579.10 (the "Transfers"). The Transfers were made as follows:

| Check Date | Payment Date | Payment Amount | Receipt Date |
|---|---|---|---|
| 11/13/00 | 11/22/00 | $329,498.30 | 11/21/00 |
| 12/11/00 | 12/19/00 | $ 61,080.80 | 12/18/00 |
| | Total | $390,579.10 | |

## DISCUSSION

*Code § 547(c)(2)*

Toastmaster asserts that the Transfers are protected by the "ordinary course of business" defense provided by Code § 547(c)(2).

In its post-trial briefs, Toastmaster separates the invoices that were paid by the Transfers into two groups: one subject to the Big Buy program (the "Big Buy Invoices") and the other that were subject to the default "net 30" terms (the "Net 30 Invoices"). (Doc. # 110, pp. 8–9; Doc. # 116, p. 12.)

*The Big Buy Invoices*

As to Toastmaster's use of Big Buy arrangements, Richter testified that Toastmaster began offering Big Buys because of Salton's influence after the merger in 1999. (Tr. 3, p. 137, 1.13–17.) Richter testified that HomePlace decided to do a Big Buy with Toastmaster in 2000. (Tr. 3, pp. 142,

---

1. As defined in the Salton Opinion, Industry refers to the small appliance industry.

1.17—143, 1.10.) HomePlace's chief financial officer, David Frost ("Frost") testified that he was not positive as to the program's existence, but he believes there was a program based on the invoices and testimony that he reviewed. (Tr. 3, p. 172, 1.14–24.) Kennedy confirmed that it was ordinary in the Industry for the parties to begin their direct relationship with a Big Buy because of the time of year of the orders. (Tr. 3, p. 184, 1.10–22.)

Based on these reasons and the related discussion in the Salton Opinion, the Court finds there were Big Buy terms between the parties and that such terms were ordinary for the Industry.

To establish which of the invoices were Big Buy Invoices, Toastmaster offered Richter's testimony. Richter examined all of the purchase orders and invoices that were the subject of the Transfers looking for factors indicating they were part of the Big Buy program. (Tr. 3, p. 150, 1.3–8.) Such factors included order dates, promised ship dates, sequence of invoice and purchase order numbers, and long cancellation dates. (Tr. 3, p. 150, 1. 6–8; Tr. 3, p. 153, 1. 7–9.) Defendant's Exhibit 9 represents all of the invoices Richter determined were Big Buy Invoices. (Tr. 3, p. 150, 1.3–8.) HomePlace did not contest this evidence in any meaningful way and therefore the Court accepts that Exhibit 9 represents the Big Buy Invoices.

Therefore, the Court finds that Toastmaster is entitled to protect the entire amount of $243,310 in Big Buy Invoices paid pursuant to Code § 547(c)(2).

*The Net 30 Invoices*

■ As for the Net 30 Invoices paid by the Transfers, the salient factor in the ordinary course analysis is the timing of the payments. On this issue, Kennedy testified that the Industry norm was for non-Big Buy invoices to be paid 10 to 25 days late (i.e., 10 to 25 days after the expiration of the "net 30" days terms). (Tr. 2, p. 35, 1.11–16.) While the parties did not have a pre-preference period relationship, Frost testified that HomePlace's standard practice was to pay invoices 15 days late. (Tr. 3, p. 196, 1.5–13.)

To establish the parties' ordinary course practice, Toastmaster introduced Defendant's Exhibit 5. Exhibit 5 demonstrates that during the preference period, payments were made on average 16.9 days beyond the "net 30" terms. (Def. Exh. 5; Lutz, Tr. 3, p. 177, 1. 19–22.) In arriving at this figure, Toastmaster assumed a due date for each invoice of 37 days after invoice date. (Lutz, Tr. 3, p. 177, 1.24–25.)

However, similar to my findings in the Salton Opinion, I find here that Defendant's Exhibit 5 is misleading because it includes the Big Buy Invoices in calculating the average. The Big Buy Invoices are listed on Exhibit 5 as having been paid 2 to 4 days after the agreed November 10 and December 10 payment dates, whereas the Net 30 Invoices on Exhibit 5 show the number of dates late from the 37 days after the invoice date. It does not make sense for Toastmaster to shield the payments on the Big Buy Invoices as an alternative ordinary course arrangement and, in addition, include those invoices in a calculation of the average number of days late for the payment of Net 30 Invoices. Richter confirmed this point when he testified that "[t]he agreed upon terms were different" for the Big Buy Invoices and the Net 30 Invoices. (Tr. 3, p. 146, 1.3–5.) Looking to Plaintiff's Exhibits 12 and 13 which list the invoices attached to the payment checks, I have calculated that the Net 30 Invoices were paid an average of 64 days after invoice date.

Thus, the payments were made on average 34 days beyond the "net 30" terms. This is outside the range of 10–25 days

that Kennedy testified to as being normal for the Industry. In addition, this is well outside the 15 days late that Frost testified to as being HomePlace's standard practice. (Tr. 3, p. 196, 1.5–13.) Therefore, the Court finds that the Net 30 Invoices paid by the Transfers, which total $147,269.10, are not protected pursuant to Code § 547(c)(2).

*Code § 547(c)(4)*

The parties agree that Toastmaster provided $14,745.60 in new value during the preference period that remained unpaid as of the Petition Date. (Doc. # 110, pp. 23–24; Doc. # 114, p. 27.) Therefore, under Third Circuit precedent, Toastmaster is entitled to a setoff in the amount of $14,745.60.

## CONCLUSION

Based on the foregoing, Toastmaster is entitled to protect a total of $258,055.60 from avoidance: $243,310 pursuant to Code § 547(c)(2) and $14,745.60 pursuant to Code § 547(c)(4). Therefore, of the $390,579.10 originally sought to be recovered by the complaint, HomePlace is entitled to recover $132,523.50 pursuant to Code §§ 547 and 550.

## JUDGMENT ORDER

For the reasons set forth in the Court's memorandum opinion of this date, pursuant to 11 U.S.C. §§ 547 and 550, the Plaintiff is granted judgment in the amount of $132,523.50.